UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
FRANK ALBERIGO,

                                        Plaintiff,

                                                                    CV:10-04735 (NG) (JO)

        - against -

THE HARTFORD,


                                        Defendant,
-----------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN REPLY TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Frank Alberigo (herein referred to as Plaintiff), by his attorneys, Severance, Burko, Spalter & Masone P.C., submits this Memorandum of Law in Reply to The Hartford's Motion for Summary Judgment and in Support of the Plaintiff's Motion for Summary Judgment.


## INTRODUCTION

The history of this claim is well documented in defendant's brief. The Administrative Record contains a copy of Mr. Alberigo's LTD policy provided to him by his employer LaBranch & Co Inc. The policy's definition of how disability is defined can be found on page 45. The Occupation Qualifier indicates that Disability means that during the elimination period and in the following 24 months, injury or sickness causes physical or mental impairment to such a degree of severity that you are:

1. Continuously unable to perform the material and substantial duties of your regular occupation and,
2. You are not gainfully employed.

After the LTD monthly benefit has been payable for 24 months, Disability means that injury or sickness causes physical or mental impairment to such a degree of severity that you are:

1. Continuously unable to engage in any occupation for which you are or become qualified by education, training or experience; and

1

2. not gainfully employed.

In determining that Mr. Alberigo was qualified for benefits during the elimination period and the following 24 months under the "Own Occupation" standard it was determined that his own occupation, "New Accounts Clerk" was performed at a sedentary exertional Level. After the initial 24 months and upon moving to the more stringent threshold of the "Any Occupation" standard, Mr. Alberigo was advised there were jobs that he was capable of performing. It is our position that Mr. Alberigo remained incapable of performing his own occupation and any other occupation, that there was limited cardiac medical evidence of improvement and additional limitations placed on him by a second treating physician. The Hartford arbitrarily and capriciously denied continuing benefits beyond the "Own Occupation" initial 24-month period.

Defendant, in his brief, outlines an argument indicating why he believes The Hartford's determination was not influenced by a conflict interest, going to great lengths to discuss the insulation of one claims handler from another. It is our position that there is substantial evidence in the record to suggest that Mr. Alberigo's file was not provided with a reasonable analysis or review and the ultimate determination was in fact arbitrary and capricious and is suggestive of a conflict of interest. The Hartford's ability to appropriately weigh the medical evidence and render a reasonable decision is undermined by its handling of this claim. In this case The Hartford is the Plan Administrator with the full authority to interpret the plan and to make a determination as to whether or not benefits are going to be paid. Hartford is also the insurance company who will either pay benefits or reap the reward of not continuing those benefits. This is the type of conflict that the Supreme Court sought to protect ERISA claimant's against when they held that a reviewing court should consider the conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits as a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case. Metro. Life Ins. Co. v Glenn, 554 US 105, 128 S Ct 2343, 171 L Ed 2d 299 [2008]. We believe it's important that this court considers whether The Hartford abused its discretion in denying benefits. There are multiple examples of Hartford's obvious bias in denying benefits.

2

## STANDARD OF REVIEW

ERISA permits a person denied benefits under an employee benefit plan to challenge the denial in federal court. *See* 29 U.S.C. § 1132(a)(1)(B); *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 108, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). When a plan grants the administrator the authority to determine a claimant's eligibility for benefits, the reviewing court must apply a deferential standard of review. *See Glenn,* 554 U.S. at 111.[3]

The United States Court of Appeals for the Second Circuit has held that "[u]nder the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning without reason, unsupported by substantial evidence or erroneous as a matter of law." *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 132–33 (2d Cir.2008) (internal quotation marks omitted). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance." *Cerardo v. GNY Automation Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003) (alterations in original). Where the plan administrator and the claimant offer rational but conflicting interpretations of the plan, the administrator's interpretation must control. *See McCauley,* 551 F.3d at 132. Miles v Principal Life Ins. Co., 10 CIV 0702 VM, 2011 WL 6291203 [SDNY Dec. 14, 2011]

A denial of benefits under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) Knopick v Metro. Life Ins. Co., 10-4707-CV, 2012 WL 147887 [2d Cir Jan. 19, 2012]

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court established four principles with respect to such claims: (1) in determining the appropriate standard of review, courts should be guided by principles of trust law; (2) under trust law principles, a denial of benefits should be reviewed *de novo* unless the plan provides to the contrary; (3) where the plan provides the administrator or fiduciary with discretionary authority to determine eligibility for benefits, courts must apply a deferential standard of review; and (4) if a plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict is a factor to be weighed in determining whether there is an abuse of discretion. *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 110–11, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Following *Firestone,* courts in the Second Circuit

applied the *de novo* standard in circumstances where the administrator operated under a conflict of interest that affected the reasonableness of its decision. *McCauley v. First Unum Life Insurance Co.,* 551 F.3d 126, 130–31 (2d Cir.2008).

In *Glenn,* the Supreme Court clarified two aspect of its ERISA jurisprudence. First, it held that a conflict exists when an entity is both the plan administrator and the insurer, not only when the administrator is also the employer. *Glenn,* 554 U.S. at 112–15. Second, the Court determined that when a plan gives discretion to the administrator, the existence of a conflict does not sanction application of a *de novo* standard of review; rather, courts must continue to utilize a deferential standard, but consider any conflict as one factor in determining whether the decision denying benefits was arbitrary and capricious. *Id.* at 115–18. After *Glenn,* the Second Circuit modified its ERISA standards to conform to that decision. *McCauley,* 551 F.3d at 132–33; *see VanWright v. First Unum Life Insurance Co.,* 740 F.Supp.2d 397, 402 (S.D.N.Y.2010). Schrom v Guardian Life Ins. Co. of Am., 11 CIV. 1680 BSJ JCF, 2012 WL 28138 [SDNY Jan. 5, 2012]

It is our position that The Hartford's decision to terminate Mr. Albergo's benefits was arbitrary and capricious on its face. When examined under the microscope of *Glenn,* The Hartford must also, or alternatively, be deemed to have had its own self-interest in mind when processing Mr. Alberigo's Long Term Disability (LTD) claim and acted without reasonableness, arbitrarily and capriciously.

## DEFENDANT'S DENIAL OF BENEFITS WAS ARBITRARY AND CAPRICIOUS

**Where There Is No Extertional Distinction Between An Employee's "Own Occupation" And That Of The Jobs Used In An Employability Analysis Report (EAR) It Is Arbitrary And Capricious To Deny LTD Benefits Under The More Rigorous "Any Occupation" Standard.**

**Where The Extertional Limitations Set Forth In The EAR Do Not Include All Exertional Limitations Provided By All Treating Sources It Is Arbitrary And Capricious To Rely Upon The EAR, As Well As The Peer Reviewing Medical Doctor's Conclusions.**

Mr. Alberigo self reported that his job title was a New Accounts Clerk (Pages 407). The duties were opening retail and institutional accounts on a computer, file papers, update accounts, etc. The main record indicates that Rocco P. Demaria, the examiner in the Maitland Office, spoke with Mr. Alberigo and that Mr. Alberigo advised Rocco that his job was basically sitting, with

4

heavy phone and computer usage, plus some filing and lifting under ten pounds (pages 393 and 109). The following note dated September 19, 2006 indicates that Mr. Demaria spoke with Valerie at LaBranch who confirmed that Mr. Alberigo's work was heavy phone and computer usage with some standing, walking, bending, etc. The filing involved light files weighing anywhere from 1 to 10 pounds at most. It is clear from this record that Mr. Alberigo's position at LaBranche was performed at equal to or less than a sedentary exertional level.

The following note indicates that Mr. Demaria advised Mr. Alberigo that based upon the data he would be approving Mr. Alberigo's claim and would be processing benefits.

Contained in the record is a December 15, 2006 check-off report from Dr. Kloth indicating that the claimant could not return to work. On Page 364, a report dated April 12, 2007 indicates no change in physical assessment completed by Dr. Kloth. Again in a report dated March 7, 2008. Dr. Kloth checks off a box indicating sedentary, exerting up to 10 pounds of force occasionally, however he indicates in a narrative section that Mr. Alberigo has had no change in status since forms last filled out.

On March 26, 2008 Mr. Alberigo completed a form called a "Work and Educational History" form (Page 317). On page 5 of the form, Mr. Alberigo includes Dr. Goddard for the first time.

Dr. Kloth completes a functional capacity form indicating that Mr. Alberigo can lift occasionally up to 20 pounds, however he can lift nothing heavier. He goes on to indicate that the claimant can never climb or crawl, that occasionally he can stoop, kneel, and/or crouch. The doctor bases this determination on a severe LV Dysfunction and, as he is treating only for the cardiac conditions this, along with every other disability evaluation Dr. Kloth completed, is exclusively related that condition.

Of important note, on Page 298 of the Record there is an indication from the reviewer that there has been "no change in the employee's condition, and the cardiologist has checked sedentary work." The reviewer goes on to state "There does not seem to be any basis for this, and the

5

employee has had no chance status per AP. Return file to AA." Please note that this is an unsigned and undated report.

The initial claim for Short Term Disability benefits as well as Long Term Disability (LTD) benefits was predicated on an underlying cardiac medical condition (Aortic Aneurysm with significant LV Dysfunction and low ejection fraction). Late in the initial "Own Occupation" benefit period, Mr. Alberigo came under the care of Dr. Goddard for treatment of Polymyalgia Rheumatic (PMR) as well as Polyarticular Osteoarthritis and Spondyolidic Disease of the cervical spine. Pages 249-294 are medical reports provided to the Hartford by David Goddard. These medical reports date from December 2007 through June 2008. Consistent findings in these reports indicate abnormal examination of the hand with osteoarthritis; the cervical spine has abnormal findings with restricted ranges of motion; lumbosacral spine has abnormal findings with restricted ranges motion; hips have an abnormal physical examination as well as the knees and the feet. These sites of injury remain with abnormal findings from December of 2007 through June of 2008 and again are listed in a September 11, 2008 medical report.

The notes on page 83 indicate that the claim owner at that time, Donna Santeler, reviewed the file on June 26, 2008. Dr. David Goddard documented that the employee was noted to have controlled arterial fibrillation, a 10% reduction of motion of the left shoulder (which was an improvement from 2006); employee has osteoarthritis in 4 joints of the hand, restrictive range of motion of the cervical spine and lumbar spine, mild restrictive internal and external rotation of both hips which is an improvement. The employer has osteoarthritis in both knees and osteoarthritis in the small joints of the feet. She writes that, "based on the medical information, it is reasonable that employer is able to perform sedentary activities per Dr. Kloth's signed restrictions, referring the file to RCM to determine if employee's education will allow him to perform any occupation in a sedentary occupation completion with EAR."

It is important to note that none of the conditions and/or restrictions that may have been placed on Mr. Alberigo by Dr. Goddard's findings that he had osteoarthritis in 4 joints of the hands were used in evaluating Mr. Alberigo's vocational limitations, specifically page 12 of the Benefit Management Services Report (page 82 of the record) indicates that the claimant was found to

have the ability to handle and reach at all levels and would be able to frequently and bilaterally finger, feel, drive and balance in spite of the fact of having osteoarthritis in multiple joints in the hands, hips, knees and feet.

In a letter dated August 27, 2008 to Mr. Alberigo, Donna K. Santeler indicates to Mr. Alberigo that he has been denied ongoing benefits under the "Any Occupation" standard. On the third page of the letter, she specifically sites to a physical capabilities evaluation (page 222) indicating that you can perform fingering, handling, frequent balancing and lifting up to 20 pounds. Please note that this form was completed by Dr. Kloth and not by Dr. Goddard. In this letter they indicate that Mr. Alberigo would be capable of being a customer complaint clerk, a dispatcher, a referral clerk or a surveillance system monitor. These are listed at the sedentary exertional level. This is the same level of exertion he had previously been found unfit to perform under the "Own Occupation" standard.

During the period of benefits that were actually paid, under the "Own Occupation" standard, it was well accepted that Mr. Aleberigo was incapable of performing his own occupation. In letter after letter to Mr. Alberigo, almost as if to foreshadow the eventual denial of benefits, Mr. Alberigo was reminded of the more stringent "Any Occupations" standard that he would be forced to address after the initial 24 months period was over. A close inspection of the jobs found by the EAR indicates they are equal to the exertional level of "New Accounts Clerk" (as described by both the Mr. Alberigo and his employer). For example, Customer Complaint Clerk is essentially the exact same job as New Accounts Clerk. It requires "conferring with customer by telephone or in person... provide information... take orders or cancel accounts... keep records etc." (Pages 231-234). Dispatcher Services listed on pages 235 thru 238; Referral Clerk (pages 239-242) and Surveillance Systems Monitor (pages 243-248) in no fundamental way differ in exertional requirements than Mr. Alberigo's "Own Occupation."

7

**Where A Treating Physician, When Asked To Comment On Functional Limitations, Provides A Report That States Plaintiff Is Medically, Totally Disabled And Unable To Work, The Carrier's Denial Of Benefits Is Arbitrary And Capricious Without Further Evaluation By A Medical Examination If The Carrier Believes The Treating Physician's Conclusion To Be In Conflict With Prior Medical Evidence And Raises The Question Of Whether A Conflict Of Interest Prohibited The Carrier From Properly Evaluating The Report.**

**Where A Medical Report Is Not In Actual Conflict With Prior Medical Evidence, When Read Correctly And Objectively, The Carrier Raises The Inference Of Conflict Of Interest By Citing Only Portions Of The Report Rather Than The Entire Report When Making Credibility Findings.**

A review of the peer physician medical report, completed by Dr. Onwueueke summarized Dr. Goddard's letter of September 11, 2008. In doing so, Dr. Onwueueke only provided one of three listed diagnoses; the polymyalgia rheumatic (PMR). The doctor did not discuss the osteoarthritis, nor discuss the spondylosis of the spine. Most importantly there is a February 13, 2009 addendum medical report addressed to Daniel Zich from Dr. Onwueueke (Page 155) indicating that Dr. Goddard would not participate in an over the phone interview because it was his opinion that the rules of HIPAA would not allow him to do so. He felt that he would not be able to verify the doctor's identity over the phone. No further attempts were made to contact Dr. Goddard and no further attempts were made to clarify the medical record in light of the fact that he said he would provide written documentation if requested

In <u>DuPerry v Life Insurance Co of N. America</u> the district court's position on such a matter was stated as follows:

> The court noted that LINA "patently abused the claim review procedure" by "overlook [ing] substantial evidence from [DuPerry's] treating physicians that she was unable to work" and relying instead "on minor inconsistencies in and disingenuous interpretations of these physicians' reports." J.A. 1047 <u>DuPerry v Life Ins. Co. of N. Am.</u>, 632 F3d 860, 877 [4th Cir 2011]

At issue is Dr. Goddard's September 11, 2008 medical report. In both Dr. Onwueueke's peer review report and in defense's brief, this medical report is misquoted and distorted for the purposes of a denial of benefits. When reviewed line by line, the veracity and consistency of its findings and conclusions become clear.

1. **Mr. Alberigo is presently under my care.** (as evidenced by 7 months of treatment records dated December 2007 thru June of 2008)
2. **He has polymyalgia rheumatic (PMR) that is moderately active and severe polyarticular osteoarthritis effecting the hands, shoulders, hips and knees.** When we review these diagnoses, we should turn to his medical treatment notes. Most importantly

8

the June 26, 2008 medical report (Page 249) indicates that Mr. Alberigo's PMR is quiet, and that he is taking Prednisone at 4mg daily. It should be noted that quiet, as stated in this report, and moderate, as stated in the September 11, 2008 are not inconsistent or worthy of being disregarded. Dr. Goddard indicates that the shoulder examination was abnormal; the hand examination was abnormal; the cervical spine examination was abnormal with restrictive ranges of motion; the lumbosacral spine was abnormal with restrictive ranges of motion. On Page 251, the examination of the hips was abnormal with mild restriction with internal and external rotation of both hips, which is noted to be improved; the examination of the knees was abnormal with osteoarthritis in both knees the examination of the feet was abnormal with osteoarthritis of the small joints of the feet.

3. **He has spondyolidic disease of the spine.** Here again we see that it is consistent with page 250 of the record, the June 26, 2008 medical report.

4. **He is limited in upper and lower extremity function, and**

5. **He cannot bend, lift, stoop, or carry any object over five pounds.** This is of significance because Dr. Goddard is the treating doctor who was treating the musculoskeletal abnormalities. The peer review medical doctor, the Claims examiner and the EAR ignored the findings in statement 4 and 5. In any discussion of residual functional capacity, in finding that anyone can work at the sedentary exertional level, these findings have to be more appropriately regarded.

6. **He has severe heart disease. He has undergone repair of heart valves and aortic aneurism**. It should be noted that while Dr. Goddard does not treat for these conditions, he is summarizing them.

7. **He is medically totally disabled and unable to undertake any work.** Clearly the doctor has now summarized the entire paragraph above and came to a conclusion regarding his entire medical condition, not merely the one that he was treating for

Defense counsel would have this court believe that this report contradicts his "well documented medical findings in his office records." Defense counsel goes on to suggest that Dr. Goddard is in violation of NY EDUC. Law Section 6530 (32). It is clear from the record that Dr. Goddard's

medical summary was provided zero weight. It is clear from this record that Mr. Alberigo's PMR and osteoarthritis were given zero credibility and weight. The Hartford, by relying on the very sort of minor inconsistencies and disingenuous interpretations that the court in DuPerry found was borderline Bad Faith, indicative of a desire to deny benefits..

There is ample case law to support the allegation here that if the carrier totally ignored, or used disingenuous interpretations of Dr. Goddard's reports there is a valid basis for a finding of arbitrary and capricious, as well as a finding that the carrier should have had an independent medical examination performed, and that in and of itself is the basis for a finding of arbitrary and capricious.

In Brown V. Prudential, Prudential declined to have a physician examine plaintiff. It made credibility findings without the benefit of a physical examination. As noted by plaintiff's counsel in that case, credibility determinations made without such an examination support a conclusion that the decision is arbitrary and capricious. *Helfman v. GE Group Life Assurance Co.,* 573 F.3d 383, 393 (6th Cir.2009); *Smith v. Cont'l Cas. Co.,* 450 F.3d 253, 263-264 (6th Cir.2006).

> In *Helfman,* the court found that the insurer/administrator Sun Life used a combination of in-house consultants and independent consultants in reviewing Helfman's claim. *Helfman,* 573 F.3d at 393. Thus, the circuit court concluded that "the conflict of interest due to Sun Life both determining eligibility for benefits and paying those benefits should at least be considered." *Id.,* citing *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381-82 (6th Cir.2005) ( "[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism."). In addition, in *Calvert,* 409 F.3d at 295-296, the court noted that "the failure to conduct a physical examination-especially where the right to do so is specifically reserve in the plan-may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Accord, e.g., Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547, 554 (6th Cir.2008); *Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 167 (6th Cir.2007); *Smith v. Cont'l Cas. Co.,* 450 F.3d 253, 263 (6th Cir.2006); *Evans v. UnumProvident Corp.,* 434 F.3d 866, 877 (6th Cir.2006).
>
> ....like in *Helfman,* "the right to do so [conduct an examination] was reserved by the plan, and its failure to examine [plaintiff] raises questions about the thoroughness and accuracy of its review of his claim, *see, e.g.,*

*Calvert,* 409 F.3d at 295." *Helfman,* 573 F.3d at 393. Likewise, in this
case, it appears that the failure to examine plaintiff supports a conclusion
that Prudential's decision was always going to be denial. Brown v
Prudential Ins. Co. of Am., 09-11685, 2010 WL 2697124 [ED Mich May
17, 2010] report and recommendation adopted, 09-11685, 2010 WL
2696975 [ED Mich July 7, 2010]

The case before your honor suggests the same conclusion be made. The Hartford's decision was
always going to be a denial. The total denial of credibility afforded Dr. Goddard's September
11, 2008 report, combined with the disregard for any of the additional restrictions of Mr.
Alberigo's PMR, Osteoarthritis and spodylotic disease of the spine support a finding that the
decision to deny benefits was both arbitrary and capricious.

Part of the analysis for conflict of interest under Glenn has been to look at the possibility of a
pattern of denial of meritous claims:

It is the actual motivation that matters in reviewing benefits decisions for
an abuse of discretion, not the bare presence of the conflict itself.
Consonant with this understanding, a conflict of interest can support a
finding that an administrator abused its discretion only where the evidence
demonstrates that the conflict actually motivated or influenced the claims
decision. Such evidence may take many forms. It may, for example,
appear on the face of the plan, see *Pegram v. Herdrich,* 530 U.S. 211, 227,
n. 7, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (offering hypothetical
example of a plan that gives "a bonus for administrators who denied
benefits to every 10th beneficiary"); it may be shown by evidence of other
improper incentives, see *Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263,
1265 (C.A.8 1997) (insurer provided incentives and bonuses to claims
reviewers for "claims savings"); or it may be shown by a pattern or
practice of unreasonably denying meritorious claims, see **2355 *Radford
Trust v. First Unum Life Ins. Co. of Am.,* 321 F.Supp.2d 226, 247
(D.Mass.2004) (finding a "pattern of erroneous and arbitrary benefits
denials, bad faith contract misinterpretations, and other unscrupulous
tactics"). The mere existence of a conflict, however, is not justification for
heightening the level of scrutiny, either on its own or by enhancing the
significance of other factors. Metro. Life Ins. Co. v Glenn, 554 US 105,
123, 128 S Ct 2343, 2354-55, 171 L Ed 2d 299 [2008]

The Hartford has been before multiple Cicuit courts on this very issue.

> "where an administrator exercises its discretion to conduct a file review,
> credibility determinations made without the benefit of a physical
> examination support a conclusion that the decision was arbitrary."
> *Helfman,* 573 F.3d at 395-96. Any "determinations of credibility made
> without having met or examined [a] claimant and contrary to [the]
> findings of [a] treating physician supports finding that [the] denial of
> benefits was arbitrary and capricious." *Id.* at 396 (describing holding of
> *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 296-97 (6th Cir.2005))
> <u>Mennucci v Hartford Life and Acc. Ins. Co.</u>, 2:09-CV-900, 2010 WL
> 4642919 [SD Ohio Nov. 9, 2010]

Quoting extensively from an additional ruling against the same carrier, the court in <u>Perterson v.</u>
<u>Hartford Life Insurance</u> stated:

> Plaintiff argues that Hartford gave presumptive weight to the opinions of
> its own, non-examining physicians, over the opinions of Plaintiff's
> doctors. Indeed, she argues that Defendant's doctors made credibility
> findings without appropriately giving deference to the diagnoses of
> Peterson's treating physicians. The Supreme Court has held that the
> "treating physician rule" does not apply in the context of ERISA claims,
> and those regulations that require a full and fair assessment of claims "do
> not command plan administrators to credit the opinions of treating
> physicians over other evidence relevant to the claimant's medical
> condition." *Black and Decker Disability Plan v. Nord,* 538 U.S. 822, 825,
> 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Indeed, there is nothing
> "inherently objectionable about a file review by a qualified physician in
> the context of a benefits determination." *Calvert v. Firstar Finance, Inc.,*
> 409 F.3d 286, 296 (6th Cir.2005). Rather, whether a doctor has physically
> examined a claimant is one factor a court may consider in determining
> whether a decision to deny benefits was arbitrary and capricious. *See id.* at
> 295; *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Boston,* 419
> F.3d 501, 508 (6th Cir.2005).
> In considering how much weight to afford a file reviewer's opinion, the
> Court must determine whether that opinion includes credibility
> determinations. In *Calvert,* the court held that the ERISA plan
> administrator relied almost exclusively on its own physician's file review,
> while ignoring surgical reports, x-rays, CT scans, and the SSA
> determination that documented the claimant's disability. 409 F.3d at 296.
> The court stated that "[w]here ... the conclusions from that [file] review
> include critical credibility determinations regarding a claimant's medical
> history and symptomology, reliance on such a review may be inadequate."
> *Id.* at 297, n. 6. Furthermore, in *Helfman v. GE Group Life Assurance Co.,*
> 573 F.3d 383, 395 (6th Cir.2006), the court held that where a plan
> administrator's own doctor could have performed a physical examination
> and chose not to, and subsequently made a credibility determination, that

is a factor for determining whether the administrator's decision was arbitrary.

Here, the file reviews contain multiple credibility determinations. Dr. Brusch, for example, stated that Plaintiff's diagnosis appears to be based solely on her complaint rather than functional limitations. (H00092). The file reviews by doctors Knapp and Siegel extensively list Plaintiff's medical history, but merely conclude that she is not disabled from performing "Any Occupation." Indeed, even though he recites Peterson's extensive medical history, Dr. Knapp merely concludes that, "[t]he records do not document clinically significant clinical medical findings that support any restrictions and limitations from a physical or cognitive perspective." (H00122). Similarly, Dr. Siegel concluded that, "Ms. Peterson should be physically capable of performing at least sedentary to light physical demand work activities." (H00094). He made credibility determinations that the Plaintiff is "independent with activities of daily living and instrumental activities of daily living." (*Id.*).

The Court finds that Defendant's reliance on medical conclusions from file reviews is a factor that weighs in favor of Plaintiff in deciding whether Defendant's decision to deny benefits was arbitrary and capricious. With the ability under the Policy to conduct its own examinations, Defendant instead relied on its own file reviews. Furthermore, the file reviews contained credibility determinations. Given the fact that the file reviewers did not actually examine Plaintiff, and their conclusions contained numerous credibility determinations, the Court views such statements with skepticism and finds that they are entitled to less weight. Peterson v Hartford Life and Acc. Ins. Co., 2:11-CV-10932, 2011 WL 6000776 [ED Mich Nov. 30, 2011]

***There is no evidence in the administrative record to suggest that an inherent conflict of interest influenced Hartford's decision. However, Defendant's decision-making process is highly indicative of one aimed at denial of benefits rather than affording proper regard for the fiduciary duties owed to a claimant. Indeed, Defendant did not take the opportunity to have its doctors examine Plaintiff, even though those doctors rejected outright the medical determinations of Plaintiff's treating physicians…. It is evident that Hartford's dual role as insurer and administrator of the LTD policy interfered with an objective review of the record. See Id. at 8.*** (Emphasis Added)

The most recent case ruling against The Hartford, dated as January of 2012, in a case not too dissimilar from this one, Robert Bragg v Hartford Life and Accident Insurance Company the court stated:

The Sixth Circuit has repeatedly noted that there is "nothing inherently objectionable about a file review by a qualified physician in the context of

a benefits determination." *Calvert,* 409 F.3d. at 296. However, given the
differences between the opinion of Plaintiff's treating physicians set forth
in the peer review reports and the opinions set forth in the written reports
and letters submitted by Plaintiff to Hartford, the Court finds that
Hartford's reliance on the peer review reports to be unreasonable....
...Acceptance of the peer review physician's statements concerning the
limitations the treating physicians imposed without a clarification by
Hartford of the different opinions articulated in the written reports weighs
in favor of a finding that Hartford's denial of benefits is arbitrary and
capricious.
Furthermore, Hartford did not order an Independent Medical Examination
of Bragg and instead relied on the peer review reports discussed above.
While there is "nothing inherently objectionable about a file review by a
qualified physician," the failure to conduct a physical examination may
"raise questions about the thoroughness and accuracy of the benefits
determination" and may suggest that an insurer's decision to deny benefits
was arbitrary and capricious. *Calvert,* 409 F.3d at 295–296; *Glenn v.
MetLife,* 461 F.3d 660, 671 (6th Cir.2006)(decision to resolve conflict
through file review rather than examination is relevant factor in deciding if
administrator decision is arbitrary and capricious). <u>Bragg v Hartford Life
and Acc. Ins. Co.</u>, 4:11CV-00002-JHM, 2012 WL 32605 [WD Ky Jan. 6,
2012]

In the case before your honor we see a similar pattern of a decision making process that is

outcome driven and "highly indicative of one aimed at denial of benefits rather than affording

proper regard for the fiduciary duties owed to a claimant." It is clear from this record that The

Hartford dual role of as insurer and Administrator interfered with its objective review of the

records as a whole when making credibility findings and disability determinations.

A final point must be made regarding The Hartford's disregard for making a reasonable,

objective and fair determination of Mr. Alberigo's LTD claim. In footnote 5 in the defendant's

brief, carrier indicates that Mr. Alberigo never provided The Hartford with a copy of the SSDI

Notice of Award, and therefore The Hartford never received any information regarding the

Social Security Administration's rationale for awarding benefits, nor was it aware of what

medical records the Social Security Administration had before it when making it's benefit

determination. The record indicates that Mr. Alberigo signed an authorization for The Hartford

to get a copy of the Social Security File (pages 357 and 358) and the Hartford had no trouble

getting the payment information so that they may adequately recoup the benefits that were paid

during the "Own Occupation" disability period. It is disingenuous of The Hartford to state that

they had no ability to have a copy of the Notice of Award, or the Notice of Decision providing the rationale for SSDI benefits but were fully capable of generating the paperwork from the Social Security Administration to recoup money.

## CONCLUSION

Finally, contrary to Western-Southern's argument, the highly deferential standard of review applicable in this case does not automatically mandate adherence to Western-Southern's decision. "Review under [the arbitrary and capricious] standard is extremely deferential and has been described as the least demanding form of judicial review. It is not, however, without some teeth." *Cozzie v. Metropolitan Life Ins. Co.,* 140 F.3d 1104, 1107-08 (7th Cir.1998) (internal citation omitted). " 'Deferential review is not no review,' and 'deference need not be abject.' " *Hess v. Hartford Life & Accident Ins. Co.,* 274 F.3d 456, 461 (7th Cir.2001)(quoting *Gallo v. Amoco Corp.,* 102 F.3d 918, 922 (7th Cir.1996)). McDonald v W.-S. Life Ins. Co., 347 F3d 161, 172 [6th Cir 2003]

As indicated above, deferential review is not NO REVIEW. As outlined in *Glenn* there is a genuine concern when a plan administrator is also the plan payer/plan determiner. In this case we see multiple examples of The Hartford Insurance Company failing to provide a full, fair and accurate claims review to achieve its higher goal of denying benefits to Mr. Alberigo. Firstly, there is no distinction between his sedentary work as a New Accounts Clerk and the other job titles that were provided to Mr. Alberigio. In light of the fact that there was no change in his condition as well as added restrictions placed upon Mr. Alberigo by Dr. Goddard and no distinguishable difference between the jobs the ERA provided and that of his actual occupation, the denial of benefits under the "Any Occupation" standard was an arbitrary and capricious determination; one that opens the inquiry into whether the carrier lost sight of its duty to avoid conflicts of interest.

Secondly, The Hartford failed to appropriately evaluate one of the treating sources medical evidence and instead looked for minor inconsistencies and had disingenuous interpretations of this physician's report. This is outcome driven interpretation of medical evidence with the sole purpose of denying benefits. Dr. Goddard had indicated that he would be more than willing to clarify his medical records had he been asked in writing to do so. The Hartford chose not to.

Their sole choice was an over-the-phone interview. These interviews are undocumented in the record other than by the Peer Reviewer's descriptions and conclusions. In claims such as this one, where the record is closed at the Federal Level, and where the carrier denies any discovery or cross-examination of the Peer Reviewer or the treating doctor, we are left with a "Star Chamber" like decision-making process that lacks transparency. It is highly suggestive of one aimed at denial of benefits rather than affording proper regard for the fiduciary duties owed to a claimant, of arbitrariness, of capriciousness and of failing to adequately protect itself from succumbing to its conflicts of interests. This court should look to the actions of The Hartford in this matter with great skepticism and concern, particularly in light of what the *Glenn* decision indicates is of great concern to the adjudicators of ERISA Claims.

Mr. Alberigo hereby respectfully requests that this court reverse determination of his Long Term Disability benefits, and find as a matter for law, that Mr. Alberigo was entitled to receive LTD benefits until his sixty-fifth birthday, as provided for in the Policy.

Severance, Burko & Spalter

Louis R. Burko  (LB-2371)
*Attorney for Plaintiff*
189 Montague Street, Suite 900
Brooklyn, NY 11201
Tel. (718) 625-2300

## ATTORNEY'S VERIFICATION

**United States District Court )**
**Eastern District of New York   )**

I Louis R. Burko**,** an attorney at law, hereby affirms pursuant to the C.P.L.R. and subscribing as true under penalty of perjury, as follows:

I am an attorney at the firm of the attorney of record for the Plaintiff(s) in the entitled action.

I have read the foregoing Memorandum and know the contents thereof; that same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters I believe the same to be true.

This verification is made by the affiant and not by the Plaintiff(s) because said do(es) not reside within the county in which I maintain my office for the practice of law.

The grounds of affiant's belief as to all matters not stated upon affiant's knowledge are as follows: **Books, record and notes maintained by my office and conversations with others.**

Dated: February 1, 2012
Brooklyn, New York

_____
Louis R. Burko, Esq.

Sworn to before me this

1ST day of February, 2012

_____

Notary Public

DOLORES A. MARRA
Notary Public, State of New York
No. 01MA613078
Qualified in Kings County
Commission Expires 3-3-20__

17